683 F.2d 491
 221 U.S.App.D.C. 150
 SEA-LAND SERVICE, INC., Petitioner,
v.
UNITED STATES of America and Federal Maritime Commission, Respondents,
Japan Line, Ltd., et al., Lykes Bros. Steamship Co., Inc.,
United States Lines, Inc., Intervenors.
AMERICAN PRESIDENT LINES, LTD., Petitioner,
v.
UNITED STATES of America and Federal Maritime Commission, Respondents,
United States Lines, Inc., Japan Line, Ltd., et al., Lykes
Bros. Steamship Co., Inc., Intervenors.
UNITED STATES LINES, INC., Petitioner,
v.
UNITED STATES of America and Federal Maritime Commission, Respondents,
Japan Line, Ltd., et al., Intervenors.
 Nos. 81-1123, 81-1130 and 81-1206.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 25, 1981.
Decided July 13, 1982.
 
 Petitions for Review of Orders of the Federal Maritime commission.
 I. Michael Greenberger, Washington, D. C., with whom Robert T. Basseches, Philip P. Frickey, Edward M. Shea and Paul J. McElligott, Washington, D. C., were on the brief, for American President Lines, Ltd. and Sea-Land Services, Inc., petitioners in Nos. 81-1123 and 81-1130.
 Russell T. Weil, Washington, D. C., with whom James P. Moore, Washington, D. C., was on the brief, for United States Lines, Inc., petitioner in No. 81-1206 and intervenor in Nos. 81-1123 and 81-1130.
 Charles F. Warren, Washington, D. C., with whom George A. Quadrino, Washington, D. C., was on the brief, for Japan Line, Ltd., et al., intervenors in Nos. 81-1123, 81-1130 and 81-1206.
 Carol J. Neustadt, Atty., Federal Maritime Com'n, Washington, D. C., with whom Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Com'n, Washington, D. C., was on the brief, for respondent Federal Maritime Com'n. C. Jonathan Benner, Atty., Federal Maritime Com'n, Washington, D. C., also entered an appearance for respondent, Federal Maritime Com'n. John J. Powers, III, Robert J. Wiggers and Barry Grossman, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent, United States of America.
 J. Alton Boyer and William H. Fort, Washington, D. C., entered appearances for Lykes Bros. Steamship Co., Inc., intervenor in Nos. 81-1123 and 81-1130.
 Before MacKINNON and EDWARDS, Circuit Judges, and ROBB, Senior Circuit judge.
 Opinion for the Court filed by Senior Circuit Judge ROBB.
 ROBB, Senior Circuit Judge:
 
 
 1
 This is a petition to review an order of the Federal Maritime Commission approving without an evidentiary hearing the extension of certain space charter and revenue pooling agreements among six Japanese shipping lines. Petitioners are three United States-flag common carriers by water, Sea-Land Service, Inc. (Sea-Land), American President Lines, Ltd. (APL), and United States Lines, Inc. (USL). Lykes Bros. Steamship Co., Ltd. (Lykes), also a U. S.-flag carrier, has intervened in support of petitioners. The six Japanese lines, Japan Line, Ltd., Kawasaki Kisen Kaisha, Ltd., Mitsui O. S. K. Lines, Ltd., Nippon Yusen Kaisha, Showa Line, Ltd., and Yamashita-Shinnihon Steamship Co., Ltd., have intervened in support of the Commission. Because we believe the petitioners have raised material factual issues relevant to the approvability of the agreements, we remand to the Commission with instructions to conduct an evidentiary hearing.
 
 
 2
 Section 15 of the Shipping Act of 1916, 46 U.S.C.A. § 814 (West 1975 & Supp.1982), requires common carriers by water to obtain Commission approval of any agreements limiting competition between them.[1] Modifications or cancellations of such agreements are likewise subject to Commission approval. Id. The Commission is required, after notice and hearing, to disapprove, cancel, or modify any agreement that "it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest." Id. Agreements which are approved by the Commission are exempt from the antitrust laws. Id.
 
 
 3
 The six agreements at issue here are within the ambit of section 15. Four are space charter agreements which provide for the cross-chartering of space and coordination of sailings of the containerized vessels of the signatories. Various aspects of the U. S.-Japan trade are covered by the four space charter agreements. Agreement No. 9718 concerns the trade between ports in California and ports in Japan and Korea. Agreement No. 9731 applies to the trade between Japan and ports in California, Hawaii and Alaska. Agreement No. 9835 applies to service between Japan and ports in Oregon and Washington. Agreement No. 9975 deals with the trade between ports in Japan and ports on the U. S. Atlantic Coast. These agreements permit the parties jointly to schedule and advertise their sailings, charter and subcharter space among themselves, interchange their containers and related equipment, and share administrative expenses.
 
 
 4
 The remaining two agreements pertain to revenue pooling and permit the sharing of a certain percentage of revenues among the signatories. Pooling Agreement No. 10116 covers the trade between Japan and the United States West Coast. Pooling Agreement No. 10274 covers the trade between Japan and United States East Coast ports.
 
 
 5
 Each of the Japanese lines is a party to several of the agreements, but none is a signatory to all six. Four Japanese lines are signatories to Agreement No. 9718, two are parties to Agreement No. 9731, and five are parties to Agreement No. 9975. All six carriers are signatories to Agreement No. 9835 and Pooling Agreement No. 10116. Five carriers are parties to Pooling Agreement No. 10274.
 
 
 6
 Notice of the proposed modification, which sought extension of the six agreements for three years, from August 22, 1980 to August 22, 1983, was published in the Federal Register on April 29, 1980. 45 Fed.Reg. 28,487 (1980). All the petitioners and Lykes filed protests and comments with the Commission. A number of issues were raised, including: (1) allegations that the Japanese lines engaged in bloc voting in their shipping conferences, thereby frustrating policies and actions favored by other conference members; (2) failure of the signatories to abide by the geographic limitations specified by the agreements; (3) the effect of the agreements on overtonnaging, an industry term which refers to an excess of vessel capacity offered by the carriers over that necessary to carry the available cargo; (4) undue vagueness of the agreements; (5) whether the agreements give Japanese lines an unfair advantage over and discriminate against competing carriers; (6) improper revenue pooling and inadequate reporting of activities pursuant to the agreements; (7) the relationship between the Japanese lines, industry and government; (8) whether the purported benefits from the agreements could be achieved by less restrictive means; and (9) other anticompetitive effects of the agreements when considered in light of preexisting economic relationships among the signatories. The Japanese lines filed responses disputing the contentions raised by the protestants and arguing against the need for an evidentiary hearing.
 
 
 7
 On August 13, 1980 the Commission's Managing Director submitted a staff memorandum to the Commission which recommended that the proposed extension be set down for investigation and hearing. The memorandum noted that the protestants had raised numerous issues, many of which remained unresolved. Since there were relevant and material issues going to the approvability of the agreements, the staff memorandum concluded an evidentiary hearing was required.
 
 
 8
 A majority of the Commission voted on October 7, 1980 to approve the extension of the agreements, subject to the imposition of "certain changes deemed necessary to limit their anticompetitive impact." (J.A. 379) On January 16, 1981 the Commission issued an order conditionally approving the proposed modification and extending the agreements through August 22, 1983.[2] Classifying the issues raised as falling into two categories, the Commission concluded a hearing was not required. As classified by the Commission the first category issues consisted of those relating to allegations of unlawful bloc voting by the Japanese lines, which the Commission found to be not relevant or material to the approvability of the agreements. The Commission did, however, indicate that by separate order it would institute a factfinding investigation to consider the bloc voting charge.[3] The second category of issues was a general one which included the benefits of the agreements, the relationship between the Japanese lines and the Japanese government, the reporting requirements, the impact on overtonnaging, the alleged exceeding of geographic limits, the language of the agreements, possible service limitations on the agreements, and the possibility that the agreements should be open to U. S.-flag carriers. Because the Commission viewed these issues as questions of law or policy, rather than fact, it concluded that no hearing was necessary.
 
 
 9
 The conditions imposed by the Commission were intended to address some of the issues. Thus, the Japanese lines were required to amend the agreements within sixty days to require semi-annual reports to the Commission, to limit revenue pooling to revenues generated by cargo carried on the signatories' containership vessels operated pursuant to the agreements, and to limit total vessel TEU capacity subject to the agreements to the total vessel TEU capacity currently operated pursuant to the agreements.[4] On March 6, 1981 the Japanese lines informed the Commission they would accept these conditions.
 
 
 10
 Two commissioners dissented. Vice Chairman Kanuk argued that these were precisely the types of issues which must be resolved before approving agreements under section 15 of the Shipping Act. She cited the bloc voting charge as an example of an unresolved factual issue, which the majority apparently recognized since it stated a factfinding investigation would be instituted to ascertain the nature and extent of any bloc voting. Unlike the majority, Vice Chairman Kanuk believed the bloc voting allegations were relevant to the question of whether the agreements should be approved because section 15 requires the Commission to determine whether agreements unjustly discriminate or are unfair as between carriers. Kanuk also contended a hearing was required because of several other issues, such as the geographic scope of the agreements, and the relationship between the Japanese lines, industry and government. Kanuk concluded the Commission had abused its discretion by ignoring these issues and approving the agreements without an adequate factual basis. Commissioner Teige also dissented, stating that an investigation should have been conducted to determine whether the Japanese plan was merely a commercial agreement or was directed by the Japanese government and whether the plan was contrary to the public interest requirements of the Shipping Act. Commissioner Teige concluded that the Commission should not "fail to pay close attention when carriers, of whatever flag, raise substantial objections to what is, on its face, an anticompetitive arrangement." (J.A. 438)
 
 
 11
 Petitioners then sought review in this court. On July 18, 1981 we denied their motion for summary reversal of the Commission's decision and scheduled the case for oral argument. Sea-Land Service, Inc. v. United States, Nos. 81-1123, et al. (D.C.Cir. July 18, 1981).
 
 
 12
 Petitioners contend the Commission erred by denying them an evidentiary hearing on the issues raised pertaining to approval of the three-year extension of the agreements. Section 15 of the Shipping Act states in relevant part:
 
 
 13
 The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications or cancellations.
 
 
 14
 46 U.S.C. § 814 (1976). Formal evidentiary hearings pursuant to sections 556 and 557 of the Administrative Procedure Act, 5 U.S.C. §§ 556 and 557 (1976), are not required by section 15 because Congress did not so indicate. United States Lines, Inc. v. FMC, 189 U.S.App.D.C. 361, 378-79, 584 F.2d 519, 536-37 (1978). See also United States v. Florida East Coast Railway, 410 U.S. 224, 234-38, 93 S.Ct. 810, 815-817, 35 L.Ed.2d 223 (1973); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 756-58, 92 S.Ct. 1941, 1950, 1951, 32 L.Ed.2d 453 (1972). Thus, depending upon the nature of the case and the issues requiring resolution, the Commission has substantial flexibility to structure the hearings it must provide. United States Lines, Inc. v. FMC, 189 U.S.App.D.C. at 379, 584 F.2d at 537. As we said in Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 420 F.2d 577 (1969), "(t)he requirement of a hearing in a proceeding before an administrative agency may be satisfied by something less time-consuming than courtroom drama." Id. at 21, 420 F.2d at 589. Of course, the Commission's flexibility in structuring its hearings must be exercised in harmony with the requirements of fairness. Seatrain International, S. A. v. FMC, 189 U.S.App.D.C. 388, 392, 584 F.2d 546, 550 (1978). And, even though a formal evidentiary hearing is not required, the Commission must conduct whatever proceedings are necessary to ensure that it has sufficient information so that its final decision reflects a consideration of the relevant factors. Id. An evidentiary hearing must be conducted when there are disputed issues of material fact. See City of Los Angeles v. FMC, 128 U.S.App.D.C. 326, 327, 388 F.2d 582, 583 (1967). See also Public Service Co. of New Hampshire v. FERC, 195 U.S.App.D.C. 130, 141, 600 F.2d 944, 955, cert. denied, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979); Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. at 21 n.36, 420 F.2d at 589 n.36; Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 232, 414 F.2d 1125, 1128 (1969). Conversely, an evidentiary hearing is not required when the disposition of the case does not involve material issues of fact. Public Service Co. of New Hampshire v. FERC, 195 U.S.App.D.C. at 141, 600 F.2d at 955; Outward Continental North Pacific Freight Conference v. FMC, 128 U.S.App.D.C. 199, 202 n.9, 385 F.2d 981, 984 n.9 (1967) (per curiam); Persian Gulf Outward Freight Conference v. FMC, 126 U.S.App.D.C. 159, 164-65, 375 F.2d 335, 340-41 (1967).
 
 
 15
 The Commission found that all of petitioners' charges, except for the bloc voting claim, raised questions of law or policy rather than fact. As to bloc voting, the Commission found it was not relevant or material to the approval of the agreements. The Commission's brief in this court says that at most some of the issues raised were questions of mixed fact and law. Brief for Respondents at 25-26.
 
 
 16
 We disagree with the Commission's characterization of the issues here as questions of law or policy. Our review of the record convinces us that a number of issues raised by petitioners clearly involve questions of fact which require an evidentiary hearing. To illustrate this point we will briefly detail the material disputes presented by the parties.
 
 
 17
 The principal issue contested by the parties was whether the Japanese lines constitute a joint service and engage in bloc voting in their respective conferences. The Commission apparently recognized the factual nature of this dispute, but found that it was not relevant or material to the approvability of the agreements. APL argued the Japanese lines had achieved functional control of the trans-Pacific conferences and therefore have the capability of blocking actions with which they disagree. Comments of American President Lines, Ltd. submitted to the Federal Maritime Commission at 3 (J.A. 124) Moreover, APL alleged the Japanese have demonstrated a tendency toward bloc voting on important issues and that the "Japanese carriers' voting practices have regularly resulted in the defeat of policy and rate actions favored by a majority of the conference carriers and have acted to the serious detriment of the trades and the remaining conference members." Id. at 3-4. (J.A. 124-25) APL also considered the agreements under the fifteen indicia set forth by the Commission in In re Agreement No. 9973-3-Johnson ScanStar Service Voting Provision, 21 F.M.C. 217 (1978), and concluded that the Japanese lines satisfied most of the criteria of a joint service. APL Comments, supra at 9-13. (J.A. 130-34) These allegations were supported by the affidavit of Raymond A. Velez, a Sea-Land official:
 
 
 18
 I have for some time observed the behaviour of the Japanese lines in conference activities .... However, it has been my observation that on all matters for which voting behaviour is observable and which are of significant importance to the conference activities and/or to the Japanese carriers, the Japanese lines vote identically and as a bloc. This is true of policy matters, and of those rate matters which closely affect Japanese interests.
 
 
 19
 Affidavit of Raymond A. Velez submitted to the Federal Maritime Commission (May 27, 1980), at 3-4. (J.A. 138-39) Mr. Velez cited several matters on which the Japanese appeared to have voted as a bloc, such as rates for cotton exported to Japan and other North Asia countries from the United States, rate proposals for individual commodities moving to and from Korea, intermodal rates in the export trades from the United States, opposition to adoption of conference self-policing rules, and rate policies in general. Id. at 4-6. (J.A. 139-41) He averred that bloc voting by the Japanese carriers resulted in upheavals in the trans-Pacific trades, instability, attraction of nonconference tonnage into the trade, and deterioration of the trans-Pacific conferences' market position. Id. at 7-8. (J.A. 142-43)
 
 
 20
 The comments filed by Sea-Land also raised the bloc voting issue:
 
 
 21
 Sea-Land has a single vote in that conference, while the Japanese carriers, operating what amounts to a joint service, had six votes. The Japanese usually voted as a bloc in the conferences, giving them substantial weight, and in many instances negative control, over conference proposals. The Japanese voted unanimously against Sea-Land's proposal for independent action to meet non-conference competition in the Trans-Pacific Freight Conference of Japan and Korea. Voting patterns by the Japanese operators have been detrimental to the interests of U. S.-flag carriers. Sea-Land therefore has substantial interests which have been and are affected, often adversely, by the agreements.
 
 
 22
 Letter from Paul J. McElligott, Attorney for Sea-Land Service, Inc. to the Federal Maritime Commission at 7 (May 27, 1980). (J.A. 149) A Sea-Land official submitted an affidavit which supported these charges. Affidavit of Ronald B. Gottshall submitted to the Federal Maritime Commission at 4 (May 27, 1980). (J.A. 160) Lykes argued that the Japanese carriers operating under the agreements constituted a joint service under the Johnson ScanStar test and should be limited to one vote in conference decisions. Protest of Lykes Bros. Steamship Co., Inc., submitted to the Federal Maritime Commission at 10-13 (May 7, 1980). (J.A. 180-83) The comments submitted by USL reached a similar conclusion. Letter from Russell T. Weil and James W. Pewett, Attorneys for United States Lines, Inc., to the Federal Maritime Commission (May 27, 1980). (J.A. 188-93)
 
 
 23
 The Japanese lines disputed the bloc voting charges and denied that they constituted a joint service. Reply in Opposition to Protestants' Comments submitted to the Federal Maritime Commission at 7-28 (July 25, 1980). (J.A. 202-23) They also contested the suggestion that their votes are directed by the Japanese government. Id. at 25. (J.A. 220) Toshiro Nishioka, an official with Mitsui O. S. K. Lines, Ltd., submitted an affidavit responding in depth to the charges made by the protestants. Rebuttal Affidavit of Toshira Nishioka submitted to the Federal Maritime Commission at 3-20. (J.A. 267-84) Therefore, a disputed issue of fact was squarely presented as to whether the Japanese lines engaged in bloc voting.
 
 
 24
 Related to the bloc voting issue is the dispute over the extent and significance of the Japanese government's role in formulating the policies and practices of the shippers. The proponents of the agreements noted at the outset:
 
 
 25
 (T)he Agreement and the modifications referred to, as well as the matter of new construction, were all subject of directives and continuing direction from our government, the Ministry of Transport. While the specific terms of the Agreement were left to ourselves to devise in consultation with our attorneys, the principles embodied in the Agreement were the subject of governmental directive. Indeed, our government has been directly concerned with the container revolution from its beginning, and it is from this early governmental effort did a national policy for the operation and construction of our containerships evolve.
 
 
 26
 Affidavit of Toshiro Nishioka submitted to the Federal Maritime Commission in Support of Agreement No. 9718-7 at 5. (J.A. 7) See also Affidavit of Toshiro Nishioka submitted to the Federal Maritime Commission in Support of Agreement No. 9835-5 at 5. (J.A. 55); Affidavit of Toshiro Nishioka submitted to the Federal Maritime Commission in Support of Agreement No. 9975-7 at 9-10. (J.A. 78-79); Affidavit of Toshiro Nishioka submitted to the Federal Maritime Commission in Support of Agreement No. 10116-4 at 1-2 (J.A. 90-91); Affidavit of Toshiro Nishioka submitted to the Federal Maritime Commission in Support of Agreement No. 10274-1 at 2. (J.A. 109a) A Nippon Yusen Kaisha official stated:
 
 
 27
 (O)ur Agreement and the matter of vessel construction have always been a subject of Ministry direction in implementation of a national transportation policy and ... we, as Japanese national flag carriers, have not been in a position to operate our services in any manner other than that directed by our government.
 
 
 28
 Affidavit of Hiroshi Takahashi submitted to the Federal Maritime Commission in Support of Agreement No. 9731-8 at 5. (J.A. 35) The objectives and policies of the Japanese Ministry with respect to the Japanese carriers were detailed in a letter to the Commission in 1976. See Letter from Shigoya Goto, Director General of Shipping Bureau, Ministry of Transport, to the Federal Maritime Commission (Jan. 14, 1976). (J.A. 20-22)
 
 
 29
 The protestants contended the Japanese government exercised substantial influence over the agreements in a manner which unfairly discriminated against competing carriers. USL alleged:
 
 
 30
 It is explicitly recognized in the preamble of the agreements and has been repeatedly set forth in the affidavits, that this web of agreements was created and guided by a single hand, namely the Japanese Government, and function as a "governmentally directed" undertaking responding to a single policy. The provisions of each of the agreements and the supporting rationalizations likewise indicate that to carry out the purposes of the agreements the lines of necessity must vote as one.
 
 
 31
 Letter from Russell T. Weil and James W. Pewett, Attorneys for United States Lines, Inc., to the Federal Maritime Commission at 2 (May 27, 1980). (J.A. 189) The protestants thus contended that the Japanese lines were operating under the direction of the Japanese government in formulating and implementing the agreements. Moreover, the American carriers alleged that Japanese government control resulted in bloc voting by the proponents.
 
 
 32
 The Japanese submitted materials to rebut the charges of undue government influence over the control and operation of the agreements. Reply in Opposition to Protestants' Comments, supra at 25. (J.A. 220) Toshiro Nishioka's rebuttal affidavit averred that the Ministry of Transport did not direct the voting practices or operation of the Japanese lines, but only provided policy direction. Rebuttal Affidavit of Toshiro Nishioka, supra at 4. (J.A. 268) The Japanese Ministry of Transport said that the Ministry
 
 
 33
 orally directed to the Six Japanese Shipping Lines as early as December of 1966 to take necessary measures including formulation of space charter arrangement for stabilizing the trade between Japan and North America. In November 1973, the same direction was issued for introduction of pooling arrangement.
 
 
 34
 The ministry did not devise the specific agreement terms and provisions. These are matters which are left for commercial determination among the participating parties.
 
 
 35
 Letter from Hiroshi Nagai, Director-General, Shipping Bureau, Ministry of Transport, to Richard J. Daschbach, Chairman, Federal Maritime Commission at 1-2 (August 12, 1980). (J.A. 341-42) Again, the parties squarely presented a disputed issue of fact which requires an evidentiary hearing. The American lines contend the Japanese government exercises undue influence over the direction of the agreements and the activities of the Japanese lines, while the Japanese deny it.
 
 
 36
 The parties also disputed the effects of the agreements. The Japanese lines contended they had a favorable impact on shipping and described a number of specific benefits which would result from continued approval. One such benefit is an ameliorating effect on the serious overtonnaging problem currently existing in the trades. By allowing the parties to cross-charter space on each others' vessels, the number of "sailings" each can provide is increased without increasing the number of vessels or the tonnage in the trade. Affidavit of Toshiro Nishioka in Support of Agreement No. 9718-7, supra at 6-7. (J.A. 8-9) Allegedly, an overall reduction in overtonnaging would result. Id. at 11. (J.A. 13) In the absence of the agreements, Nishioka predicted "(d)rastic and serious increases in the overtonnaging problem." Id. at 13. (J.A. 15) Mr. Nishioka filed affidavits in support of Agreements Nos. 9835-5 and 9975-7 which made similar claims. See Affidavit of Toshiro Nishioka in Support of Agreement No. 9835-5, supra at 7, 8, 13. (J.A. 57, 58, 63); Affidavit of Toshira Nishioka in Support of Agreement No. 9975-7, supra at 12, 14. (J.A. 81, 83) See also Affidavit of Hiroshi Takahashi in Support of Agreement No. 9731-8, supra at 10, 12. (J.A. 40, 42)
 
 
 37
 The protestants contended, however, that the agreements would exacerbate the overtonnaging problem. The comments filed by Lykes, for instance, alleged that under the agreement the Japanese lines had continually added capacity to the Far East trade despite the acknowledged overtonnaging. Protest of Lykes Bros. Steamship Co., Inc., supra at 5-7. (J.A. 176-78) Lykes also noted that the Japanese lines had never withdrawn any ships from service under the agreement even though vessel utilization rates had declined. Id. at 5. (J.A. 176)
 
 
 38
 In their rebuttal materials, the proponents claimed "the Agreements have enabled the parties to stabilize the number of vessels in the trade and have not, as some protestants claim, exacerbated the 'overtonnaging problem.' " Reply in Opposition to Protestants' Comments, supra at 3-4. (J.A. 198-99) The reply also responded specifically to the allegations made by Lykes, arguing that additional vessel capacity was warranted, utilizations were high, and it was not economically feasible to withdraw vessels from service when fluctuations in cargo, competition, and utilization occurred. Id. at 28-36. (J.A. 223-31) Mr. Nishioka stated that the overtonnaging in the trades at issue "has been caused by substantial and continuing capacity increases by carriers other than ourselves, including increases by these commentators and many nonconference lines, while our own services have been stabilized for the past several years." Rebuttal Affidavit of Toshiro Nishioka, supra at 2. (J.A. 266) Referring specifically to the charges made by Lykes, Nishioka contended that withdrawing vessels from service during periods of low utilization is not feasible and that unnecessary vessels have not been added. Id. at 20-28. (J.A. 284-92) He also disputed Sea-Land's suggestion that the Japanese lines could achieve coordinated sailings through the use of a sailing agreement rather than space charters, claiming that overtonnaging would result because more vessels would be required to provide the desired frequency of service. Id. at 28-30. (J.A. 292-94)
 
 
 39
 The Japanese contended that in addition to alleviating overtonnaging, other benefits would accrue from continued implementation of the agreements, such as greatly improved service, (J.A. 13, 39, 40, 55, 56, 82, 102, 118) lower costs and capital investment, (J.A. 14, 40, 57, 82) reduced inventory requirements, storage expenses and related capital commitments for shippers and consignees, (J.A. 14, 41, 82) avoidance of cargo congestion at ports, (J.A. 14, 41, 82) reduced intransit handling problems for shippers and consignees, (J.A. 14, 41, 57, 82) prompt and dependable cash flow to shippers from consignees (J.A. 14, 41, 57, 82-83) and less fuel consumption. (J.A. 14, 41, 58, 83) According to the Japanese, the agreements were also beneficial because they eliminated excessive competition without eliminating all competition. Affidavit of Toshiro Nishioka in Support of Agreement No. 10116-4, supra at 10-11 (J.A. 99-100) They also argued that the agreements would serve to discourage competitive malpractices. Id. at 13. (J.A. 102) See also Affidavit of Toshiro Nishioka in Support of Agreement No. 10274-1, supra at 13. (J.A. 118)
 
 
 40
 Disputing these assertions, the American lines contended the agreements entailed severe anticompetitive effects, particularly because of the pre-existing economic relationships among the signatories, and that the benefits to be realized were not as great as claimed. Sea-Land maintained the Japanese had not shown the agreements were necessary in order to produce the alleged benefits. McElligott Letter, supra at 8-9. (J.A. 150-51) Mr. Gottshall questioned the specific benefits relied on by the Japanese, such as improved space utilization. Gottshall Affidavit, supra at 6-9 (J.A. 162-65) The American lines also emphasized the structure of Japanese industry which allegedly enabled the Japanese lines to obtain unfair competitive advantages. For example, the Velez affidavit stated:
 
 
 41
 In the Japan market (and to a more limited extent in other Far East markets where Japanese commercial interests are strong) the Japanese lines, because of their close relationships with the Japanese trading houses, have a lock on a significant portion of the cargo which moves. This position is well known and was specifically taken note of in the Commission's North Pacific Study of last fall. (See pages 3-4) Because of this assured reservoir of cargo the Japanese lines, until very recently, have consistently insisted on maintaining rates at an elevated level in the Japan trade and in the other Far East trades where they have substantial commercial ties. (In contrast, the Japanese lines have been consistent advocates of low rates in the areas where Japanese commercial interests are limited and to which, in consequence, the Japanese carriers provide only limited service and on an incremental pricing basis.) While this policy-which the Japanese have been successful in enforcing because of the practical veto they have on conference activities-has operated to the benefit of the Japanese lines, it has had just the opposite impact on the remaining carriers which are subject to the ordinary forces of competition.
 
 
 42
 Velez Affidavit, supra at 6. (J.A. 141) Plainly, the question of what effects the agreements would have if they were continued, was a contested issue of fact.
 
 
 43
 A dispute was also presented over the alleged failure of the Japanese lines to observe various limits and requirements specified in the agreements. Sea-Land charged:
 
 
 44
 By their terms, the agreements, other than Agreement 9718, apply solely to the Japan/U. S. trades. But service under the agreements extends much further. Agreement 9718 did not apply to Korea until 1979. But the parties to Agreement 9718 had carried an average of more than 14,000 TEU's annually from Korea to the U. S. Pacific Coast for 1976-78. The extent to which the parties move under the agreements cargoes originating or destined at places other than the trades covered by the agreements must be determined. As the attached affidavit of Ronald B. Gottshall points out (paragraph 11), the parties have moved on agreement vessels cargoes originating at Singapore at extremely low rates. No previous approval of these agreements applies to the Singapore/U. S. trade.
 
 
 45
 McElligott Letter, supra at 6. (J.A. 148) The protestants also referred to the pooling provisions of the agreements. Sea-Land noted:
 
 
 46
 (T)he pooling agreements permit the pooling of revenues from cargoes not carried on the vessels subject to the consortia agreements, but carried on other semi-container and conventional vessels of the parties. The semi-container and conventional vessel services are not identified. The volume of cargo moving in these services is not shown. The type and number of vessels, and the countries between which they operate, are not disclosed.
 
 
 47
 McElligott Letter, supra at 6-7. (J.A. 148-49) The agreements are also criticized as vague and reporting under them is termed inadequate. See McElligott Letter, supra at 10 (J.A. 152); Lykes Protest, supra at 13-18. (J.A. 183-86) The Japanese lines deny these charges. See Reply in Opposition to Protestants' Comments, supra at 51-53, 54-57. (J.A. 246-48, 249-52)
 
 
 48
 By detailing the factual disputes which exist in this case we do not intend to pass on the merits of the parties' allegations. The Commission erred in the first instance by incorrectly characterizing the issues raised as law or policy ones, rather than factual. It is the Commission's responsibility to weigh the merits of the charges and respond accordingly.
 
 
 49
 Although the mere allegation that there are disputed facts does not require an administrative agency to conduct an evidentiary hearing, see General Motors Corp. v. FERC, 211 U.S.App.D.C. 202, ---, 656 F.2d 791, 798 n.20 (1981), the Commission here implicitly acknowledged the validity of petitioners' allegations by imposing conditions on the approval of the agreements. These conditions addressed in part the issues raised by petitioners. Semi-annual reporting requirements were added, revenue pooling was limited and vessel capacity was restricted. Approving agreements subject to such conditions, however, cannot fulfill the Commission's obligation to resolve disputed issues of fact by means of an evidentiary hearing. As the Commission itself observed in the present case, "the imposition of a condition cannot obviate the need for a hearing, where one is otherwise required." (J.A. 402)[5]
 
 
 50
 The Commission's treatment of the bloc voting allegations merits separate consideration. Petitioners contended that by engaging in bloc voting the Japanese lines exercised a disproportionate influence over conference decisions, thereby producing an anticompetitive effect. Although the Commission did not deny that there were disputed issues of fact pertaining to bloc voting by the Japanese lines within their trade conferences, it concluded a hearing was not necessary because the issue was not material or relevant to the approval of the agreements. Rather than conduct an evidentiary hearing on the bloc voting issues, the Commission decided to initiate a separate investigation and did not withhold approval pending the outcome of the investigation.
 
 
 51
 We think the Commission's conclusion is erroneous. This court has previously recognized the relevance of bloc voting to the approvability of agreements pursuant to section 15. In Farrell Lines, Inc. v. FMC, 155 U.S.App.D.C. 63, 475 F.2d 1332 (1973) (per curiam), petitioners challenged an order approving a joint service agreement which permitted the signatories to retain individual voting rights within their trade conference. In response to petitioners' contention that the parties were in effect a single entity and that to allow them multiple votes was to discriminate unjustly against the other conference members, we said "(i)f this contention is valid the Commission is required by 46 U.S.C. § 814 (1970) to withhold approval of the Agreement." 155 U.S.App.D.C. at 64, 475 F.2d at 1333. The Commission's order was affirmed because it was not shown that the agreement was inherently discriminatory, but we directed the Commission to retain jurisdiction over the matter so that an expeditious adjustment could be made if experience revealed that the agreement operated unfairly. Id. at 65, 475 F.2d at 1334. Although the Farrell case concerned a joint service agreement which specifically provided for multiple voting by the parties, its principle applies to the case at bar. Otherwise parties to such agreements would be able to evade full scrutiny under section 15 merely by omitting an express voting provision. From the standpoint of discriminatory and anticompetitive effects, we see no material difference between agreements which expressly permit multiple voting and those which merely do not prohibit it.
 
 
 52
 Our recent decision in Sea-Land Service, Inc. v. FMC, 209 U.S.App.D.C. 289, 653 F.2d 544 (1981), also noted the relevance of voting issues in Commission determinations. Sea-Land petitioned for review of a Commission order modifying the initial decision of an Administrative Law Judge (ALJ) which had approved two agreements permitting joint commercial activity. Upon review of the ALJ's decision, the Commission modified the agreements in several respects, including the provisions for voting. As approved by the ALJ, the agreements provided that whenever a party entered a conference as a member of a joint service it would cast only one vote in concert with the other joint service members. Thus, multiple voting was not allowed. Id. at ---, 653 F.2d at 548. On review, the Commission modified the single vote rule with respect to one of the agreements and allowed the parties to exercise one vote each. Id. at ---, 653 F.2d at 549. Finding that the Commission thereby had effected major modifications in the agreements without affording interested parties the notice and hearing required by section 15, we vacated and remanded the Commission's order for further hearing.
 
 
 53
 The Commission also has emphasized the fundamental importance of voting issues. In In re Agreement No. 9973-3-Johnson ScanStar Service Voting Provision, 21 F.M.C. 217 (1978), the Commission held a hearing to consider protests to a voting provision which allowed each party to the agreement an individual vote in conference decisions. Explaining the unacceptability of multiple voting when the carriers in effect constitute a joint service, the Commission said:
 
 
 54
 Where the members of a joint service have a community of interest so that they constitute, in effect, a single carrier, provisions in the joint service agreement allowing for multiple votes foster a violation of the Shipping Act if the joint service joins any conference not limiting it to one vote.
 
 
 55
 Id. at 225. To assist in determining when an agreement should be deemed to constitute a single carrier so as to require restrictions on multiple voting, the Commission set forth fifteen indicia to be considered on a case-by-case basis. Id. at 226. Applying these indicia to the case before it, the Commission concluded that the joint service at issue did in fact constitute a single carrier. Id. Therefore, approval of the agreement was conditioned on modification of the voting provision so as to prohibit multiple votes for the parties in conferences or other voting bodies. Id. at 227.
 
 
 56
 We hold accordingly that allegations of bloc voting are indeed relevant and material to the approvability of section 15 agreements. Voting is a fundamental aspect of conference participation and membership. Bloc voting by conference members who effectively constitute a joint service permits these parties to aggregate and wield voting power in such a way as to dominate conference decisions unfairly and may have anticompetitive effects. In fulfilling its duty to protect the public interest, the Commission is required to consider the anticompetitive implications of agreements submitted to it for approval. FMC v. Pacific Maritime Ass'n, 435 U.S. 40, 53-54, 98 S.Ct. 927, 935-936, 55 L.Ed.2d 96 (1978); FMC v. Seatrain Lines, Inc., 411 U.S. 726, 739, 93 S.Ct. 1773, 1781, 36 L.Ed.2d 620 (1973); United States Lines, Inc. v. FMC, 137 U.S.App.D.C. at 17, 420 F.2d at 585. Having conceded that the bloc voting allegations made by petitioners are factual issues, the Commission must afford them the appropriate hearing and should consider whether the agreements need to be modified to preclude multiple voting.
 
 
 57
 We note further that the initiation of a separate investigation into petitioners' bloc voting charges by the Commission does not satisfy the requirements of section 15. The Commission must determine whether agreements unjustly discriminate or are unfair between carriers prior to granting approval. Petitioners alleged the agreements resulted in bloc voting, thereby discriminating against other carriers in conference decisions. This is precisely the type of determination that Congress has required the Commission to make. When Congress mandated that shipping agreements are subject to Commission approval, after notice and hearing, it meant exactly that. The Commission is not free to grant approval and subsequently investigate the merits of agreements at its leisure to the detriment of competing shippers and the public interest which it is required to protect. Moreover, the Commission's investigatory procedures do not afford parties rights of participation that they would enjoy in a hearing. Under the applicable Commission rules, the investigatory proceedings are nonpublic, counsel for private parties may only participate when a client is compelled to testify, and private parties have no right to subpoena witnesses or conduct discovery. 46 C.F.R. §§ 502.281-.291 (1981).
 
 
 58
 Accordingly we remand to the Commission with directions to conduct a hearing on the disputed material issues of fact raised by the petitioners, including the following: (1) the occurrence and effects of bloc voting within conferences that include signatories to the agreements; (2) potential anticompetitive effects of the agreements resulting from pre-existing economic relationships among the signatories; (3) the observance by the signatories of the geographic limitations, pooling limits, and reporting, requirements specified in the agreements; (4) the occurrence and effects of overtonnaging in the trades covered by the agreements and the potential impact the agreements will have on this problem; and (5) the extent and significance of any involvement of the Japanese government in formulating the policies and practices of the signatories. The Commission should also consider any other material issues of disputed fact raised by petitioners that constitute more than bare allegations.
 
 
 59
 So ordered.
 
 
 
 [1]
 Section 15 defines agreements to include understandings, conferences and other arrangements but excludes certain maritime labor agreements. 46 U.S.C.A. § 814 (West Supp.1982) The agreements required to be filed with the Commission for approval are those:
 fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement.
 Id.
 
 
 [2]
 The agreements had continued in effect after the scheduled August 22, 1980 expiration date due to three interim extensions granted by the Commission
 
 
 [3]
 On April 29, 1981 the Commission instituted a nonadjudicatory investigation into the voting practices of the conference members serving the trans-Pacific trade. 46 Fed.Reg. 23,992 (1981)
 
 
 [4]
 The term "TEU" refers to a twenty feet equivalent unit, a unit of volume used to designate the container capacity of a vessel. Each TEU has a volume of 1,000 feet
 
 
 [5]
 The dissenting commissioners and the Commission's staff report also recognized the need for a hearing. Vice Chairman Kanuk, for example, noted "the majority's discussion of the issues involved clearly demonstrates that questions of fact have been raised and not resolved." (J.A. 406) Thus, she concluded the Commission was "not only ignoring issues raised by protestants, it is approving the agreements without an adequate factual basis for doing so." (J.A. 408) The staff report recommended that an evidentiary hearing be held because there were "unresolved relevant and material issues going to the approvability of the agreement." (J.A. 359)