AVESTA AB and Avesta Stainless Inc., Plaintiffs,

v.

UNITED STATES, Defendant,

Allegheny Ludlum Steel Corporation, et al., Defendant–Intervenors.

No. 85–10–01497.

United States Court of International Trade.

June 7, 1988.

Freeman, Wasserman & Schneider (Jack
Gumpert Wasserman, Patrick C. Reed and

Edwin C. Bullock, New York City, on the motion), for plaintiffs.

Lyn M. Schlitt, Gen. Counsel, Michael P. Mabile, Asst. Gen. Counsel, U.S. Intern. Trade Com'n (Jack M. Simmons, III, Washington, D.C., on the motion), for defendant.

Collier, Shannon, Rill & Scott (David A. Hartquist, Paul C. Rosenthal and Patrick B. Fazzone, Washington, D.C., on the motion), for defendant-intervenors.

## MEMORANDUM OPINION

CARMAN, Judge:

Plaintiffs commenced this action seeking an order invalidating and vacating the determination of the United States International Trade Commission [ITC or Commission] in 50 Fed.Reg. 43613 (October 28, 1985) [*Dismissal of Request*]. The ITC dismissed plaintiffs' request for review and modification or revocation of a 12–year old finding of dumping against stainless steel plate from Sweden.

This action concerns in part the novel question of what standard governs a determination of whether changed circumstances are "sufficient" to commence a review investigation of an affirmative injury determination under section 751(b) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675(b) (1982) and 19 C.F.R. § 207.45(b)(2) (1985) of the ITC's regulations.

Plaintiffs allege that the ITC applied too stringent a standard in determining wheth- er the changed circumstances were sufficient to warrant review. They contend the ITC should have applied the "reasonable indication" standard governing a preliminary injury determination pursuant to section 733(a) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673b(a) (1982). Plaintiffs further urge that the ITC's conclusions regarding the specific circumstances alleged to be sufficient to warrant review lack a rational basis in fact and were not based on adequate procedures. In short, plaintiffs contend the ITC determination is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of section 516A(b)(1)(A) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(b)(1)(A) (1982).[1]

For the reasons that follow, the Court finds that the standard applicable in a preliminary injury determination under § 1673b(a) is different from the standard governing a determination of changed circumstances sufficient to warrant review of an affirmative injury determination. It is not without significance that in the former, there has been no agency determination whatsoever; whereas in the latter, there has been an affirmative determination of injury. Although the agency determinations appear in both situations to have a reasonable and rational basis in fact and to be designed to enable the agency to "weed out" those cases clearly without merit, the statutory mandates requiring action in the proceedings are somewhat different.[2] The

1. Pursuant to Rules 7, 56, and 56.1 of the Rules of this Court, plaintiffs have moved for summary judgment and judgment upon the agency record. Rule 56 sets forth the procedures governing a motion for summary judgment. Plaintiffs appear to seek summary judgment to challenge the ITC's refusal to accept additional materials from plaintiffs after the deadline for submission had elapsed.

The practice comment of Rule 56.1 provides that "[a]n action in which the determination of the court is to be made solely upon the basis of a record made before an agency shall be submitted for determination pursuant to this rule unless the court otherwise directs." Both the scheduling order of the Court dated January 30, 1986 and the minutes of a telephone conference held on the same day between the Court and the parties in this case indicate that plaintiffs would submit a rule 56.1 motion for judgment on the

agency record. During the conference, all of the parties agreed that the Court could consider plaintiffs' allegation that certain materials were improperly excluded at the administrative level. The parties further agreed that the materials themselves would not constitute a part of the administrative record considered by the Court. Thus, the Court determines that plaintiffs' application including their challenge of the ITC's refusal to accept additional materials shall be treated as a motion for judgment on the agency record.

2. In a preliminary, injury determination, the ITC must determine whether or not there is a reasonable indication of injury:

Except in the case of a petition dismissed by the administering authority under section 1673a(c)(3) of this title, the Commission, within 45 days after the date on which a petition is

Court further finds the agency properly applied the governing standard, and its conclusions regarding changed circumstances sufficient to warrant review were reasonable and supported by a rational basis in fact. Lastly, the Court finds the ITC's application of its own regulations to prohibit the submission of a reply brief that was untimely filed was a reasonable procedure consistent with the agency's discretion to fashion its own rules of procedure and comported with due process.

### FACTUAL BACKGROUND

The facts of this case date back to 1973 when the Treasury Department made a finding of dumping against stainless steel plate from Sweden, T.D. 73–157, and published notice of this finding in 38 Fed.Reg. 15079 (June 8, 1973). The finding was based in part on a determination by the United States Tariff Commission "that an industry in the United States is being injured by reason of the importation of stainless steel plate from Sweden being sold at less than fair value." Stainless Steel Plate From Sweden, Inv. No. AA1921–114, TC Pub. 573, at 1–2 (May, 1973) [1973 Determination].

On July 8, 1985, 12 years after issuance of the antidumping duty order, the ITC received a request to review that injury determination. The request was filed on

filed under section 1673a(b) of this title or on which it receives notice from the administering authority of an investigation commenced under section 1673a(a) of this title, shall make a determination, based upon the best information available to it at the time of the determination, of whether there is a *reasonable indication* that—

    (1) an industry in the United States—
    (A) is materially injured, or
    (B) is threatened with material injury, or
    (2) the establishment of an industry in the United States is materially retarded,
by reason of imports of the merchandise which is the subject of the investigation by the administering authority. If that determination is negative, the investigation shall be terminated.

19 U.S.C.A. § 1673b(a) (1980 & Supp.1988) (emphasis supplied). The petition filed pursuant to this subsection must contain allegations of the requisite elements for the imposition of duties and be accompanied by supporting information reasonably available to the petitioner:

behalf of Avesta AB, the sole Swedish producer and exporter of stainless steel plate and its affiliated company, Avesta Stainless, Inc., a U.S. producer of stainless steel plate [collectively referred to as Avesta]. Avesta asked the ITC to commence a review for the purpose of determining whether a United States industry would be materially injured or threatened with material injury if the 1973 dumping finding were modified or revoked. In its request, Avesta alleged the existence of certain changed circumstances believed to be "sufficient" to warrant review of the 1973 injury determination. *See* List No. 1 of the Administrative Record, Pub.Doc. 1, *Avesta AB v. United States* (No. 85–10–01497) [Pub. Doc.].

In accordance with 19 C.F.R. § 207.45(b)(2) of the agency's regulations, the ITC issued notice of the filing of the petition and requested public comments regarding Avesta's request for review. *See* 50 Fed.Reg. 31056 (July 31, 1985). The notice provided that "[a]ll comments must be filed no later than 30 days after the date of publication of this notice in the Federal Register." *Id.* Therefore, all comments had to be filed no later than August 30, 1985. The ITC specifically requested comments about the following changed circumstances alleged to be sufficient to warrant a review investigation:

An antidumping proceeding shall be commenced whenever an interested party described in subparagraph (C), (D), (E), or (F) of section 1677(9) of this title files a petition with the administering authority, on behalf of an industry which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and which is accompanied by information reasonably available to the petitioner supporting those allegations. The petition may be amended at such time, and upon such conditions, as the administering authority and the Commission may permit.

19 U.S.C.A. § 1673a(b)(1) (1980 & Supp.1988). With a review of an affirmative injury determination, by contrast, the information concerning, or the request for review must show "changed circumstances" sufficient to warrant review of the determination. After the investigation is *commenced,* the party seeking revocation bears the burden of persuasion with respect to the issue of changed circumstances sufficient to warrant *revocation. See* 19 U.S.C. § 1675(b)(1).

(1) Imports of Swedish plate into the United States are commercially insignificant and statistically *de minimis,* representing less than one percent of apparent U.S. consumption of plate in every year but one since 1976; (2) The number of companies producing stainless steel plate in Sweden has fallen from four producers with four mills in 1972 to one producer with two mills in 1985; (3) In 1976, a predecessor of Sweden's sole remaining producer of stainless steel plate acquired Borg Warner Corporation's Ingersoll Division mill at New Castle, IN, and by 1984 this mill's share of apparent U.S. consumption of stainless steel plate had greatly increased; and (4) In 1972, Sweden and the European Community (EC) entered into a bilateral trade agreement which allowed Swedish plate duty-free entry into the EC; today, Swedish exports to the EC are almost 20 times the quantity exported to the United States. *Dismissal of Request,* 50 Fed.Reg. at 43613–14.

On August 30, 1985, the deadline for filing comments, the ITC received a memorandum in opposition to the request for review from the defendant-intervenors, Allegheny Ludlum Steel Corporation, Armco Inc., LTV Steel Company, Jessop Steel Corporation, Washington Steel Corporation, and the United Steelworkers of America, AFL/CIO–CLC. *See* Pub.Doc. 6. The intervenors contended that a review investigation was not warranted because none of the circumstances alleged in the petition constituted a change in those factors underlying the 1973 injury determination.

On September 5, 1985, six days after the expiration of the 30–day comment period, Avesta submitted a reply to the intervenors' memorandum in opposition to the request for review. Plaintiffs sought to rebut certain alleged facts contained in the domestic industry's response. The reply was not accepted for filing and was returned to Avesta as untimely.

On September 30, 1985, the ITC extended the administrative deadline for action on the petition. After considering the request for review and all responses to the petition, a majority of the ITC[3] ruled that the petition did not show changed circumstances sufficient to warrant a review of the 1973 injury determination regarding stainless steel plate from Sweden. *See Dismissal of Request,* 50 Fed.Reg. at 43613–14.

Plaintiffs contend the ITC erred in dismissing Avesta's request for a review investigation. There is no dispute that the Court must hold unlawful this determination if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A). This standard is understood to comprise the following principles:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc., supra,* [419 U.S. 281] at 285 [95 S.Ct. 438 at 442, 42 L.Ed.2d 447]; *Citizens to Preserve Overton Park v. Volpe, supra,* [401 U.S. 402] at 416 [91 S.Ct. 814, 824, 28 L.Ed.2d 136]. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

3. The vote was 3–2 against initiation of a review investigation. Chairwoman Stern and Vice Chairwoman Liebler did not concur with the statement of reasons contained in the notice.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1982). Thus, ITC action is not arbitrary and capricious as long as there is a rational basis in fact for the determination, and the decision is not contrary to law. *Suwannee S.S. Co. v. United States*, 79 Cust.Ct. 19, 23–24, C.D. 4708, 435 F.Supp. 389, 392 (1977). *See also* S.Rep. No. 249, 96th Cong., 1st Sess. 252, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 638.

## DISCUSSION

### I. *The Legal Standard*

■ The principal issue in this case concerns the standard governing a determination under 19 U.S.C. § 1675(b)(1) of whether changed circumstances are sufficient to warrant a review investigation of an affirmative injury determination in an antidumping investigation.[4] This section provides in pertinent part as follows:

> Whenever the ... Commission receives information concerning, or a request for the review of ... an affirmative determination made under section ... 1671d(b) ... 1673d(b) ... of this title, which shows changed circumstances sufficient to warrant a review of such determination, it shall conduct such a review after publishing notice of the review in the Federal Register.... During an investigation by the Commission, the party seeking revocation of an antidumping order shall have the burden of persuasion with respect to whether there are changed circumstances sufficient to warrant revocation of the antidumping order.

19 U.S.C.A. § 1675(b)(1) (1980 & Supp. 1985).

Avesta alleges the ITC made an obvious error of law by deciding the ultimate issues during the earliest stage of the proceedings, that is, at the preliminary changed circumstances stage. In the plaintiffs' view, the only question before the ITC at this stage was whether the changed circumstances alleged in the petition were "sufficient" to warrant review. The defendant urges that Congress has left the determination of changed circumstances sufficient to warrant a review investigation to the Commission's discretion for determination on a case-by-case basis.

In discerning the standard applicable in a preliminary changed circumstances determination, it is necessary to review the regulatory framework from which § 1675(b)(1) has evolved. Prior to 1979, antidumping duties were imposed pursuant to the Antidumping Act of 1921, 19 U.S.C. § 160 (1921), *repealed by* the Trade Agreements Act of 1979, Pub.L. 96–39, § 107, 93 Stat. 144, 193. In 1954, the authority to investigate injury was bestowed upon the United States Tariff Commission (Tariff Commission) (predecessor title of the ITC). *See* Customs Simplification Act of 1954, Pub.L. 83–768, § 301, 68 Stat. 1136, 1138 (1954).

Although the Antidumping Act of 1921 did not address the issue of review investigations, the Tariff Commission and the ITC periodically reviewed existing injury determinations. *See, e.g.,* Primary Lead Metal From Australia and Canada, Inv. Nos. AA 1921–134A–135A, USITC Pub. 772 (April, 1976); Northern Bleached Hardwood Kraft Pulp From Canada, Inv. No. AA 1921–105A, TC Pub. 687 (September, 1974). In 1977, the Commission codified this practice:

> (c) *Institution of investigation.* The Commission may institute an investigation for the purposes of § 207.5(a) upon receipt of an application from an interested person, upon its own motion, or upon receipt from the Secretary of the Treasury of appropriate advice concerning an application from an interested person specifying the changed circumstances forming the basis for review, except that, in the absence of good cause being shown, no investigation for the purpose of § 207.5(a) shall be made unless 2 years have elapsed since the publication of the finding of dumping by the Secretary of the Treasury. The Commission

---

**4.** Although this case concerns a review of an injury determination in an antidumping investigation, the Court deems the reasoning of this case to be equally applicable in a review of an injury determination in a countervailing duty investigation pursuant to 19 U.S.C. § 1671d(b).

shall publish notice of the institution of an investigation in the Federal Register. 19 C.F.R. § 207.5(c) (1978).

In 1979, Congress enacted the Trade Agreements Act of 1979 to implement the results of the Tokyo Round of Multilateral Trade Negotiations. Congress added subtitle B of title VII of the Tariff Act of 1930 and repealed the Antidumping Act of 1921. Congress specified that at least once during each 12–month period beginning on the anniversary date of publication of an antidumping order, the administering authority shall review and determine the amount of any antidumping duty. *See* 19 U.S.C. § 1675(a)(1)(B) (1980). At the same time, Congress gave the ITC express authority to review an injury determination upon receipt of a request that shows changed circumstances sufficient to warrant review. *See* 19 U.S.C. § 1675(b)(1). The language of this provision makes clear that Congress intended the review process to be undertaken on a case-by-case basis, that is, upon a showing of changed circumstances sufficient to warrant a review. *See also* S.Rep. No. 249, 96th Cong., 1st Sess. 80, *reprinted in* 1979 U.S.Code & Admin.News 381, 466.

Between 1980 and 1984, the ITC considered the institution of review investigations on several occasions. *See, e.g.,* Birch Three–Ply Door Skins From Japan, Inv. No. 751–TA–6, USITC Pub. 1271 (July, 1982); Salmon Gill Fish Netting of Man-made Fibers From Japan, Inv. No. 751–TA–5, USITC Pub. 1234 (March, 1982). Thus, when Congress considered amendments to § 751 in the Trade and Tariff Act of 1984, Pub.L. 98–573, 98 Stat. 2948 (1984), there was sufficient precedent from which to draw. Despite significant and detailed amendments to § 751, Congress chose to leave this aspect of ITC practice intact. In the Court's view, this is persuasive evidence of congressional approval of a case-by-case approach to requests for review.

Arguing that the term "sufficient" in § 1675(b)(1) is analogous to the like term in the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, *opened for signature* April 12, 1979, 31 U.S.T. 4919, T.I.A.S. No. 9650 (en-tered into force Jan. 1, 1980) [Antidumping Code], plaintiffs contend: "[i]t is crystal clear that Congress intended to make the standard for initiating a review investigation analogous to the standard used in deciding whether to initiate an antidumping investigation." Motion for Summary Judgment and Judgment Upon an Agency Record at 22, *Avesta AB v. United States* (No. 85–10–01497) [Motion for Judgment on the Agency Record]. In other words, plaintiffs urge the ITC should apply the § 1673b(a) "reasonable indication" or "mere possibility" standard for preliminary injury determinations that has been elucidated in several decisions of this Court. *See, e.g., Armstrong Rubber Co. v. United States,* 9 CIT 403, 614 F.Supp. 1252 (1985); *American Grape Growers Alliance v. United States,* 9 CIT 396, 615 F.Supp. 603 (1985); *Republic Steel Corp. v. United States,* 8 CIT 29, 591 F.Supp. 640 (1984), *reh'g denied,* 9 CIT 100 (1985). In the *Republic Steel* decision, this Court required an affirmative preliminary injury determination whenever the information accompanying the petition raised the mere possibility of injury. 8 CIT at 40, 591 F.Supp. at 650. The Court further held that the ITC was precluded from weighing conflicting evidence. 8 CIT at 40, 591 F.Supp. at 650.

Plaintiffs' attempt to draw an analogy between a preliminary injury determination and a preliminary changed circumstance determination, however, disregards the "best source of congressional intent, the statute...." *American Lamb Co. v. United States,* 785 F.2d 994, 1002 (Fed.Cir. 1986). The language of § 1673b(a) provides for a determination of whether there is a "reasonable indication" of injury, language that is conspicuously absent from § 1675(b). Had Congress intended the application of an analogous standard, Congress would have chosen similar language, *i.e.,* "reasonable indication," to signify that intent. If Congress had intended earlier ITC injury determinations to be readily reviewable, Congress could have mandated periodic reviews as it had directed under § 1675(a). Indeed, Congress could have mandated review upon the mere receipt of

a request for review. Instead, Congress carefully limited the availability of § 1675(b) investigations. Congress chose to establish a screening procedure whereby the ITC would test the sufficiency of the allegations and require review only upon a showing of changed circumstances sufficient to warrant review. Furthermore, even if Congress had intended the application of an analogous standard, the United States Court of Appeals for the Federal Circuit has categorically rejected the *Republic Steel* mere possibility standard and its prohibition against considering all of the evidence. *See American Lamb*, 785 F.2d at 994. The *American Lamb* court validated ITC consideration of all evidence in a preliminary investigation including contrary evidence. The Court of Appeals rejected use of a mere possibility standard and affirmed the ITC's longstanding interpretation of "reasonable indication." *Id.* at 1001. The Court further indicated that the agency could not fulfill its limited purpose of "weeding out" those cases clearly without merit if the agency were required to proceed to a final determination whenever there might be a mere possibility of injury. *Id.* at 1002.

Even though consideration of a request for review is a preliminary proceeding, the ITC is not bound by analogy to apply the standard of § 1673b(a) for a preliminary injury determination. As the *American Lamb* Court recognized, the different stages in an antidumping proceeding are independent and have a separate and distinct focus. 785 F.2d at 1002. Grouping the standards applicable to different stages will not convert the standard that is appropriate for one stage into the standard that is applicable to another stage. *Id.*

Furthermore, due to the inherent nature of the preliminary changed circumstance determination, it is reasonable for the ITC to treat these proceedings as different from those in a preliminary injury determination. The two proceedings are fundamentally different. The former type of proceeding is designed to ascertain whether injury from alleged dumping may be occurring. Conversely, a request for review of an affirmative injury determination

and the resultant review investigation are premised upon an underlying finding of injury from dumping or subsidization which is entitled to deference and should not be disturbed lightly. *See Royal Business Machines, Inc. v. United States*, 1 CIT 80, 87 n. 18, 507 F.Supp. 1007, 1014 n. 18 (1980), *aff'd*, 669 F.2d 692 (CCPA 1982) ("The very strict controls on administrative review of prior determinations, found in 19 U.S.C. § 1675(b), are another good indication that Congress did not want these determinations to remain in a state of flux"). Indeed, the ITC must presume that dumping or subsidization is continuing to occur. *Matsushita Elec. Indus. Co., Ltd. v. United States*, 6 CIT 25, 27, 569 F.Supp. 853, 856 (1983), *rev'd on other grounds*, 750 F.2d 927 (Fed.Cir.1984). Thus, unlike the preliminary injury determination, a review investigation does not begin on a "clean slate." *Matsushita*, 750 F.2d at 932. *See also* H.R.Conf.Rep. No. 1156, 98th Cong., 2d Sess. 182, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5220, 5299 ("a section 751 review does not begin from an entirely neutral starting point").

Plaintiffs argue, however, that *Matsushita* provides that "[a] decision to undertake review is a threshold decision which merely sets the review proceedings in motion and has no bearing on the merits." Reply Brief in Support of Plaintiffs' Motion for Summary Judgment and Judgment Upon an Agency Record at 9, *Avesta AB v. United States* (No. 85–10–01497) (citing *Matsushita*, 750 F.2d at 932) (emphasis omitted). In the plaintiffs' view, *Matsushita* stands for the proposition that only in a full review investigation must the ITC be persuaded that an existing order can be revoked without material injury to the domestic industry.

The *Matsushita* decision involved an appeal by the United States and a domestic manufacturer of television receivers of a ruling of this Court which reversed the determination of the ITC not to modify or revoke an antidumping duty order. Appellees, Japanese exporters of the subject merchandise, argued that once the ITC found changed circumstances sufficient to

warrant review, it was required to conduct a review in the same neutral manner as applied in an original investigation. The Court of Appeals rejected the view that a decision to undertake a review creates an inference that the order is no longer necessary. The Court ruled that the decision to undertake a review is a threshold decision which merely sets the review proceedings in motion. *Matsushita,* 750 F.2d at 932.

Nevertheless, while the decision to undertake a review is a threshold question, this decision, pursuant to statute and regulations, may be made only when it reasonably appears that positive evidence adduced by the petitioner together with other evidence gathered by the Commission leads the ITC to believe that there are changed circumstances sufficient to warrant review. In making its determination, the ITC must be permitted to weigh conflicting evidence because "if [the ITC] were required to disregard all evidence tending to disprove the allegations in a petition, there would be neither reason nor incentive for parties other than petitioners to present their views." *American Lamb,* 785 F.2d at 1003. Because § 1675(b) provides that a review shall be undertaken by the ITC upon receipt of a request for review that shows changed circumstances sufficient to warrant review, the party seeking revocation bears the initial burden of showing the existence of such circumstances.[5] The party need not establish that the crucial factors that lead to the ITC's affirmative injury determination no longer exist since the application of such a burden would eliminate the need for a review investigation once the decision to undertake one has been made. *See Matsushita,* 750 F.2d at 932 ("The evidence submitted in support [of a request for review] may or may not be persuasive on the issue of revocation.")[6]

## II. The Alleged Circumstances

### A. The Purchase of the New Castle Plant

In their request for review, petitioners alleged that the 1976 purchase of the Ingersoll Division of the Borg Warner Corporation, a manufacturer of plate located in New Castle, Indiana, constituted a changed circumstance sufficient to warrant review. The petitioners presented an econometric study which allegedly demonstrated that the variable representing the acquisition was statistically significant in explaining the behavior of U.S. imports of Swedish stainless steel plate. The majority[7] rejected the petitioner's allegation explaining as follows:

> Nevertheless, the level of stainless steel plate imports from Sweden has not decreased since that purchase, and there was a notable increase from 1983 to

---

5. This is consistent with the international obligation to "review the need for the continued imposition of the duty, where warranted ... if any interested party so requests and submits positive information substantiating the need for review." Antidumping Code, *supra,* art. 9, para. 2. The Antidumping Code recognizes that while antidumping duties "shall remain in force only as long as ... necessary to counteract dumping which is causing injury[,]" such duties shall continue to be imposed until the need for review has been established. *See id.* para. 1.

6. By an order dated July 6, 1987, the Court granted Avesta's motion for leave to file a supplementary brief for the purpose of apprising the Court of a decision rendered in *Yuasa–General Battery Corp. v. United States,* —— CIT ——, 661 F.Supp. 1214, (1987). Plaintiffs contend the *Yuasa* decision is highly relevant in the instant case, particularly in its discussion of *American Lamb.* Plaintiffs apparently urge that the *Yuasa* Court held that while the ITC possesses discretion to weigh the evidence on the record, the

ITC's "exercise of discretion [must] be predicated upon judgment anchored in the language and spirit of the relevant statutes and regulations." Plaintiffs' Supplementary Brief at 2, *Avesta AB v. United States* (No. 85–10–01497) (citing *Yuasa General,* 661 F.Supp. at 1220).

The statement that the ITC's judgment must be anchored in the language and spirit of the relevant statutes and regulations is drawn verbatim from a decision of the Court of Appeals in *Freeport Minerals Co. v. United States,* 776 F.2d 1029, 1032 (Fed.Cir.1985). This Court must determine whether the ITC determination is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." The *Yuasa* decision is therefore not inapposite to the holding of this case.

7. In not concurring with the majority, Chairwoman Stern determined that the petition showed changed circumstances, particularly the purchase of the New Castle facility. 50 Fed. Reg. at 43614 n. 1.

1984. *Petitioners have not shown how the purchase of the domestic mill has affected the quantity of imports* of Swedish stainless steel plate and, in fact, the only impact that the petition alleges is that there will be a change in the types of stainless steel plate that will be imported in the future.

50 Fed.Reg. at 43614 (emphasis added).

Plaintiffs dispute the assertion that they failed to show how the purchase of the domestic mill has affected the quantity of imports of Swedish stainless steel plate. Plaintiffs contend the econometric study presented by them in their request for review demonstrates an inverse relationship between the acquisition and the quantity of imports.

The Court has reviewed the record presented for review and finds the agency had a rational basis in fact for its conclusion that plaintiffs failed to show how the 1976 acquisition has affected the quantity of Swedish stainless steel imports. Despite the 1976 acquisition, imports from Sweden increased between 1983 and 1984. Pub. Doc. 1 at 35. It is therefore not surprising that the ITC chose not to rely upon the econometric study. In any event, the ITC is not required to address every argument made by a party. *See British Steel Corp. v. United States*, 8 CIT 86, 98, 593 F.Supp. 405, 414 (1984); *Pasco Terminals, Inc. v. United States*, 83 Cust.Ct. 65, 85–86 C.D. 4823, 477 F.Supp. 201, 218–19 (1979), *aff'd*, 634 F.2d 610 (CCPA 1980). Furthermore, whether or not the study was reliable, it appears Avesta did not argue that the study indicated that shipments from the New Castle mill have affected U.S. imports of Swedish stainless steel plate. Instead, Avesta presented the study to forecast that imports *will decline* in the future. Pub. Doc. 1 at 83 ("The econometric models predict that *imports from Sweden will not exceed one percent* of apparent U.S. consumption in 1985, 1986 or 1987").

Plaintiffs further contend the majority failed to take into account two relevant principles of economics. The first principle asserted as applicable is that the structure of a market is "affected by mergers, acqui-

sitions, and other legal transformations through which two or more formerly independent firms come under common control." *See* Motion for Judgment Upon the Agency Record, *supra*, at 27 (quoting F.M. Scherer, Industrial Market Structure and Economic Performance 103 (1970)). The second relevant principle is actually a tenet of international economics that "exporting and direct investment often are *alternative* strategies for [participating in a foreign market]." Motion for Judgment Upon the Agency Record, *supra*, at 27 (quoting R. Caves & R. Jones, World Trade and Payments: An Introduction 489 (1973) (emphasis added)). Plaintiffs urge that the acquisition is a clear indication that Avesta is deemphasizing exports from Sweden and instead relying upon direct investment to supply the domestic market.

■ As previously discussed, a request for review of an affirmative injury determination is premised on an underlying finding of dumping, and therefore does not begin on a "clean slate." *Matsushita*, 750 F.2d at 932. Absent changed circumstances sufficient to warrant review, the outstanding antidumping order should not be disturbed. Congress intended the review process to be available on a limited basis, *i.e.*, only when the evidence shows changed circumstances such that it reasonably appears that the domestic industry will not be injured if the antidumping duty order is modified or revoked.

■ Thus, while plaintiffs urge the application of generally recognized principles of economics to support their position, these principles cannot serve as a substitute for a clear manifestation of contrary legislative intent. The language of § 1675(b) makes clear that Congress did not intend that an outstanding antidumping duty order would be modified or revoked on conjecture that a general principle of economics is applicable. Nor did Congress intend that these principles would be applied in disregard of clear and convincing contrary evidence.

■ Based upon the evidence in the record of this case, it can hardly be said that Avesta is *clearly* deemphasizing ex-

ports and pursuing the alternative strategy of direct investment. Total imports from Sweden and imports from Sweden as a percentage of apparent U.S. consumption were greater in 1978, 1979, and 1984 than they were during the first full year after the acquisition. Pub.Doc. 1 at 35. Furthermore, rather than following a decreasing trend, imports from Sweden have fluctuated since the 1976 acquisition. The Court therefore holds that the ITC's conclusion that the 1976 acquisition did not constitute a changed circumstance sufficient to warrant review was reasonable and had a rational basis in fact.

### B. *De Minimus Quantity of Imports*

In their request for review, petitioners argued that imports of Swedish plate have decreased in both absolute and relative terms and that only *de minimus* quantities are being imported from Sweden. Pub. Doc. 1 at 34–37. They urged that imports have represented less than one percent of apparent U.S. consumption of plate in every year but one since 1976. In its determination, however, the ITC concluded that this allegation was insufficient to warrant institution of a review investigation:

> It is true that imports of Swedish plate declined sharply in 1974, the year after imposition of the antidumping order. Although fluctuating from year to year, imports of Swedish plate have remained relatively constant since then although increases are apparent in 1984. We note that in addition to antidumping duty, imports of stainless steel plate from Sweden have been subject to quotas and additional duties during portions of the intervening years. The level of imports, while clearly a change from the situation at the time of our 1973 determination, is not sufficient here. The petitioners have offered no persuasive reason why the current level of Swedish plate imports in [sic] the result of anything other than import relief.

50 Fed.Reg. at 43614.

Plaintiffs argue that the decrease in imports from Sweden is not a result of import relief but is a result of the other alleged changed circumstances, particularly the acquisition of the New Castle steel mill by a predecessor of Avesta. Plaintiffs assert that from 1976 (the year in which the New Castle mill was acquired) through 1984, average annual imports have been 940 net tons. This level, plaintiffs contend, is less than 60% of the average level in the two years immediately preceding the acquisition. Plaintiffs further dispute the ITC's conclusion that imports of Swedish plate have remained relatively constant since the imposition of the antidumping duty order.

In considering this allegation, the Court is mindful of the standard that must govern this review. The determination must be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," within the meaning of 19 U.S.C. § 1516a(b)(1)(A). The Court must ascertain whether the ITC's conclusions are reasonable and have a rational basis in fact. *Suwanee S.S. Co.*, 79 Cust.Ct. at 23–24, 435 F.Supp. at 392. The Court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2867.

■ In its determination, the ITC concluded that the petitioners had offered no persuasive reason why the current level of Swedish plate imports was the result of anything other than import relief. *Dismissal of Request*, 50 Fed.Reg. at 43614. The Court finds plaintiffs have failed to show this conclusion is incorrect, and the Court further finds this conclusion is reasonable and has a rational basis in fact.

As plaintiffs' submissions reveal, between 1972 and 1973 (the year in which the antidumping duty order went into effect), imports of Swedish plate as a percentage of apparent domestic consumption declined immediately and dramatically from 11.5 percent in 1972 to 5.16 percent in 1973. Pub.Doc. 1 at 35. In 1974, the imports further declined to 0.86 percent of apparent U.S. consumption. *Id.* Although the quantity of imports from Sweden increased by almost 60 percent from 1974 to 1975, this increase as a percentage of U.S. consumption was slight as compared to the decline following the issuance of the antidumping

duty order. Despite increases in 1974 and 1975, imports as a percentage of U.S. consumption have fluctuated around one percent. *See id.* Furthermore, although the volume of imports declined following the 1976 acquisition, the decline was from the already low level of 1.16 percent of apparent U.S. consumption in 1976 to 0.87 percent in 1977 and 0.93 percent in 1978. *Id.* When compared to the precipitous decline experienced after the issuance of the antidumping duty order, this decline is insignificant. That average annual imports from Sweden since 1976 have been 940 net tons is simply an anticipated result of the issuance of an antidumping duty order. Such a result cannot form the basis for review. *See* Birch Three–Ply Door Skins From Japan, Inv. No. 751–TA–6, USITC Pub. 1271 at 4 n. 8 (July, 1982) (circumstances which are the expected result of an antidumping duty order are not changed circumstances warranting review). In sum, the ITC's conclusion that the *de minimus* quantity of imports from Sweden was not a changed circumstance sufficient to warrant review was reasonable and had a rational basis in fact.

### C. *Restructuring of Swedish Industry*

Plaintiffs contend the majority wholly failed to articulate its reasons for concluding that the restructuring of the Swedish stainless steel plate industry was not a changed circumstance sufficient to warrant review. Specifically, plaintiffs object to the ITC's failure to divulge the explanation for its decision. The ITC failed to disclose its reasoning because "the specific facts about the current state of the Swedish stainless steel plate industry as they relate to the United States market are confidential...." *Dismissal of Request*, 50 Fed. Reg. at 43614.

■ It is well established that an administrative agency must articulate a rational basis for its determination. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2867. This requirement, however, must yield to a reasonable regulation designed to prevent the unprotected and uncontrolled disclosure of confidential information to the *public. See, e.g.,* 19 CFR § 207.7 (1985) (emphasis added). Furthermore, it has been held that the ITC has retained the power and discretion to interpret its own rules regarding the disclosure of business confidential data. *See Pasco Terminals, Inc.,* 83 Cust.Ct. at 75, 477 F.Supp. at 211.

■ In applying this standard to the facts of this case, the Court finds the ITC was acting reasonably and well within its administrative discretion in refusing to disclose the confidential nature of its explanation to the public. Had the ITC divulged this information in its Federal Register notice, Avesta undoubtedly would have expressed vehement objection. Indeed, it was the plaintiffs themselves who had requested confidential treatment of the productive capacity data. It is axiomatic that plaintiffs should not now be heard to complain about this procedure.

Plaintiffs further urge that the majority's conclusion is totally wrong since "[t]he reorganization ... obviously changed the industry's basic structure and, as a consequence, radically affected the conduct of the sole remaining Swedish producer in export markets, including the United States." Motion for Judgment on the Agency Record, *supra*, at 28. Of particular import in this regard is plaintiffs' allegation that Avesta will focus its exports on higher grade exports in the future. Plaintiffs further allege that "it is blindingly obvious that a stainless steel plate industry composed of a single producer will behave in an entirely different manner from an industry composed of four independent companies." *Id.*

■ As previously stated, the decision to undertake review may be made only when it reasonably appears from the evidence gathered by the ITC that there are changed circumstances sufficient to warrant review. It is not enough for a petitioner to simply allege the existence of changed circumstances. The petitioner must come forward with sufficient facts in support of the allegations, *see, e.g.,* § 1675(b)(1), and the record as a whole must support these allegations. *See American Lamb*, 785 F.2d at 1003–04.

■ The Court holds the ITC properly concluded that plaintiffs' allegation regarding future intentions and particularly its allegation that it *will* focus its exports on the higher grade products in the future, was insufficient to satisfy this standard. A future intention does not show changed circumstances in the present. Furthermore, while the economic conduct of an industry is affected by mergers, acquisitions, and other legal transformations, *see* F.M. Scherer, *Industrial Market Structure and Economic Performance* 103 (1970), it is not "blindingly obvious" what form this economic conduct will take. It is neither obvious nor evident that a consolidation will lead to a decline in exports. Consolidation may result in a controlled or monopolistic situation. An industry comprised of one firm may attain monopoly status and thus restrict home market sales to maximize revenues. Additional tonnage may then be freed for export.

Plaintiffs urge, however, that the ITC's decision not to commence a review should not have been based upon what it believed was likely or unlikely since an investigation would have allowed the ITC to explore such issues by eliciting concrete evidence. While concrete evidence would no doubt be helpful, it is plaintiffs' duty to present those facts which would persuade the ITC to conduct a review. To require the ITC to conduct a review in all cases for the purpose of eliciting concrete evidence would be to ignore the different stages in the proceedings. It would further prevent the agency from fulfilling its duty to weed out those cases clearly without merit. *See American Lamb*, 785 F.2d at 1002.

Citing data contained in their request for review, however, plaintiffs argue that the consolidation of the Swedish industry has lead to a reduction in productive capacity. Motion for Judgment on the Agency Record, *supra*, at 28–29 (citing List No. 2

of the Administrative Record, Conf.Doc. 1 at 41–44, *Avesta AB v. United States* (No. 85–10–01497) [Conf.Doc.]). After careful consideration of the entire record presented for review, the Court finds the ITC had a rational basis in fact for concluding that the data on productive capacity does not show changed circumstances sufficient to warrant review.[8]

### D. *Swedish Trade with the European Community*

In its request for review, Avesta argued that "Western Europe has become a consistently strong, viable and growing market for Swedish stainless steel plate." Pub.Doc. 1 at 51. Avesta further urged that the availability of Western Europe as a market since 1973 was one reason why imports into the U.S. are at "de minimus" levels. *Id.* at 4–5. Avesta cited export statistics for shipments of hot-rolled plate from Sweden to the European community (EC) from 1981 through 1984. *Id.* at 51. Avesta also alleged that a change in circumstances resulted from the negotiation of a bilateral trade agreement between Sweden and the EC. *See* Agreement on Reciprocal Trade, Sweden–European Community, 15 O.J.Eur.Comm. (No. L 300) 99 (1972) [Trade Agreement].

In dismissing the request for review, the ITC determined that the Trade Agreement concluded in 1972 predated the injury determination and thus was not a changed circumstance since that time. The ITC examined the export statistics and determined that exports to the EC were actually lower at the present than they were before the 1973 determination. The ITC criticized plaintiffs' reliance upon apparent recent increases in exports to certain EC countries for the following reasons:

First, exports to the EC, even after the recent increases, remain below the levels of the early 1970s. Second, the recent

---

**8.** Due to the confidential nature of the data regarding productive capacity, the Court is constrained from providing a fuller explanation for this holding. Suffice it to say that the Court accepts the defendant's rationale contained in its confidential brief in this action that the relative capacity data cited in support of this allega-

tion is misleading. *See* Defendant's Memorandum in Response to Plaintiffs' Motion for Judgment Upon the Agency Record at 33–34, *Avesta AB v. United States*, Court No. 85–10–01497 (Confidential Version) (citing Conf.Doc. 1 at 41–44) [Confidential Memorandum of Defendant].

increase in exports depends on 1981 as the base year, and 1981 was a bad year for stainless steel production and exports worldwide. Further, access to the EC market is not unrestricted, but the levels, timing [,] product mix, and geographic distribution of Swedish steel imports are limited. Finally, EC willingness to accept imports of Swedish steel may be damped because there are now additional duties on EC exports to the United States. We note that the petition does not show any enlargement of any other market, including the Swedish domestic market for Swedish stainless steel plate. *Dismissal of Request*, 50 Fed.Reg. at 43614.

Plaintiffs dispute the ITC's conclusion that the current level of exports to the EC remains below the level of the early 1970s. They criticize the ITC's rejection of data contained in their petition. However, as noted by the Commission, the data presented by plaintiffs are seriously skewed because of the selection of 1981 as the base year. The year 1981 was a disastrous year for steel producers worldwide, and thus the level of Swedish exports to the EC in 1981 was very low. The ITC therefore properly rejected plaintiffs' data. When the data for the entire period are considered, it is evident that the ITC had a rational basis in fact for its conclusion that the levels of Swedish exports of hot-rolled stainless steel plate to the EC in the early 1970s were higher than recent levels. It also appears that there has been a slight declining trend overall in these Swedish exports to the EC. *See* Pub.Doc. 6 at Table 5.

Plaintiffs also criticize the ITC's reliance upon data contained in a memorandum submitted by the domestic industry. They urge this data was false and misleading and complain that they were not permitted to supply a memorandum to rebut this data. Plaintiffs suggest the memorandum

was misleading because it mentioned only Swedish exports of *hot-rolled* stainless steel plate and failed to mention Swedish exports of *cold-rolled* stainless steel plate to Western Europe.[9]

Whether or not the ITC properly failed to accept plaintiffs' memorandum of rebuttal,[10] the Court agrees with the intervenors that the data regarding cold-rolled plate exports to the EC are irrelevant to the ITC determination. Avesta acknowledged in its petition that the Swedish industry has never exported cold-rolled plate to the United States. Pub.Doc. 1 at 21, 24. Thus, the ITC properly considered only the level of hot-rolled plate exports to the EC since the level of exports of cold-rolled plate to the EC has no bearing on the level of imports of hot-rolled plate into the United States. Furthermore, plaintiffs' own petition refers only to hot-rolled plate *exports* to the EC. *See* Doc. 1 at 51.

Plaintiffs urge that the majority's statement concerning current restrictions on Swedish steel exports to the EC is directly contradicted by a letter submitted to the ITC by the Ambassador of Sweden which provides that there are "*no restrictions* on Swedish foreign trade in steel...." *See* Pub.Doc. 10 at 2. In the plaintiffs view, the ITC relied upon the unsubstantiated assertions of the defendant-intervenors that Sweden's access to the EC is "carefully controlled." Plaintiffs further dispute the ITC's conclusions regarding possible future restrictions on Swedish exports to the EC. Plaintiffs contend that such restrictions were not mentioned in any submission to the ITC in this case, and the ITC's conclusions are "pure speculation, without any factual or evidentiary basis whatsoever." Motion for Judgment on the Agency Record, *supra*, at 36.

In their memorandum in opposition to the request for review, however, defendant-intervenors argued that "[a] number of

---

9. Cold-rolled plate is a more finished product than hot-rolled plate. Both types involve the process of rolling heated slabs into plates. With cold-rolled plate, however, the plates are then cooled, annealed, and re-rolled to produce a higher quality finish. *See* Memorandum of De-

fendant–Intervenors in Opposition to Plaintiffs' Motion for Summary Judgment and Judgment Upon the Administrative Record at 35 n. 104, *Avesta AB v. United States*, (No. 85–10–01497).

10. This issue is addressed below.

stainless steel producing members of the EC have been found to be dumping and/or subsidizing their exports of stainless steel products to the U.S., including stainless sheet, strip and plate." Pub.Doc. 6 at 31. Thus, the possibility of future restrictions on Swedish exports to the EC was expressly addressed in a submission to the Commission. In any event, whether or not the EC is or will be an open market in principle is irrelevant since as a practical matter, as the ITC properly found, Swedish imports have not increased since the early 1970s. In other words, plaintiffs have not shown how the level of Swedish stainless steel plate exports to the EC constitutes a changed circumstance sufficient to warrant review. *See* 50 Fed.Reg. at 43614.

Plaintiffs dispute the ITC's finding that the Trade Agreement concluded in 1972 predated the injury determination and thus was not a changed circumstance since that time. Plaintiffs contend that although the Trade Agreement entered into force on January 1, 1973, four months before the ITC's 1973 determination was published, the Trade Agreement did not take *effect* until after the period of the ITC's investigation. Furthermore, plaintiffs argue, the Trade Agreement did not provide for an immediate elimination of all duties on Swedish exports to the EC; instead, the Trade Agreement provided for a staged reduction of duties over five years. Finally, plaintiffs contend that the ITC could not have considered the 1973 Trade Agreement in fact in its 1973 determination since the investigation concluded with the year 1972, and the ITC's discussion of Swedish exports to Western Europe was based on "available international statistical records [of] Swedish exports of stainless-steel plate and sheet during the period 1968–71...." 1973 Determination, *supra*, at 6.

As previously discussed, the ITC rationally concluded that the level of Swedish

exports of hot-rolled stainless steel plate to the EC, while fluctuating, has shown a decreasing trend since 1973. Thus, even assuming the Trade Agreement took effect after the 1973 determination and provided for a staged reduction in duties, plaintiffs failed to show the ITC that the Trade Agreement led to significant changes in Swedish exports to the EC and thereby affected the volume of imports of hot-rolled stainless steel plate into the United States. In fact, plaintiffs do not dispute that Swedish hot-rolled plate exports to the EC have not increased since the early 1970s. In other words, plaintiffs have failed to show the ITC's conclusion regarding the Trade Agreement is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [11]

### III. *Adequacy of the Procedures*

Plaintiffs criticize the procedures employed by the ITC and particularly the ITC's decision not to allow them to submit a reply brief six days after the expiration of the 30–day comment period. Plaintiffs sought to submit the reply to rebut the allegations made in opposition to their request for review. The reply was not accepted for filing and was returned to Avesta as untimely.

At the center of dispute is 19 C.F.R. § 207.45(b)(2) which provides that upon receipt of a request for review, the ITC shall publish notice in the Federal Register inviting public comment on the issue of whether the ITC should institute a review. The regulation does not make express provision for the submission of a reply brief. The rule merely provides that interested persons shall have at least 30 days from the date of publication in the Federal Register to submit comments to the ITC.

**11.** The Court does not disagree with plaintiffs that the ITC could not have considered the 1973 Trade Agreement in its 1973 determination since that investigation concluded with the year 1972 and was based on data for the years 1968 through 1971. The Court merely holds that plaintiffs in this request for review have failed to make a sufficient showing of how the Trade

Agreement has effected imports of hot-rolled stainless steel plate into the U.S. such that the ITC could reasonably conclude that an investigation was warranted to determine whether the domestic industry would experience material injury if the antidumping duty order were modified or revoked.

In this case, the ITC determined that 30 days would be an appropriate timeframe and indicated this fact in its Federal Register notice. Plaintiffs seemingly contest the validity of § 207.45(b)(2) since the rule was invoked to bar the submission of their reply brief.

■■■ It is widely recognized that an agency has broad discretion to fashion its own rules of administrative procedure. As the Supreme Court has repeatedly stated: "[a]bsent constitutional constraints or extremely compelling circumstances, the 'administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." ' " *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543, 98 S.Ct. 1197, 1212, 55 L.Ed.2d 460 (1978) (citations omitted). This discretion embraces the authority to set and enforce time limits on the submission of data and other materials. *See id.* at 544–45, 98 S.Ct. at 1212 (quoting *FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333, 96 S.Ct. 579, 583, 46 L.Ed.2d 533 (1976)).

It is also well established that judicial review of an agency's regulations is limited. The United States Court of Appeals for the Federal Circuit has held that the regulations must be sustained "unless unreasonable and plainly inconsistent with the statute. . . ." *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 928 (Fed.Cir.1984). *Accord Atcor Inc. v. United States*, — CIT —, —, 658 F.Supp. 295, 304 (1987). Section 207.45(b)(2) must therefore be measured against a standard of reasonableness. *See also* 19 U.S.C. § 1335 ("The Commission is authorized to adopt such *reasonable* procedures and rules and regulations as it deems necessary to carry out its functions and duties." (emphasis supplied)).

■■■ Section 207.45(b)(2), however, must be found reasonable in light of 19 U.S.C. § 1675(b), the statute it is intended to implement. Section 1675(b) provides for an investigation to determine whether or not to modify or revoke an outstanding antidumping order. The investigation is initi-ated upon receipt of a request that shows changed circumstances sufficient to warrant review. Bearing in mind that a review investigation does not begin on a "clean slate," *Matsushita*, 750 F.2d at 932, the Court must examine § 207.45(b)(2).

The Court finds this regulation is a reasonable means for determining the existence of changed circumstances sufficient to warrant review. Contrary to the plaintiffs' contention, the regulation provides plaintiffs and others similarly situated a very "real" opportunity to present arguments to persuade the ITC to conduct a review. There do not appear to be limits on the amount or kinds of arguments and proofs that can be submitted in support of the request. A comment period gives interested persons the opportunity to respond to the request for review. All of the information enables the ITC to make an informed decision. A 30–day comment period furthermore ensures that the debate does not go on indefinitely. *See ICC v. Jersey City*, 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944) (recognizes the importance of consummating the administrative process). Although the regulation does not make express provision for a reply, and the Court is cognizant of plaintiffs' concern regarding the alleged inadequacy and unfairness of such a procedure, 19 C.F.R. § 207.45(b)(2) encourages the filing of a full and accurate statement of the alleged changed circumstances in the request for review. In short, the ITC's application of a 30–day comment period comports with the agency's regulations, discretion to set and enforce time limits, and was a reasonable means for determining the existence of changed circumstances sufficient to warrant review.

Plaintiffs further contend the ITC should have conducted a hearing before resolving the issue of changed circumstances sufficient to warrant review. Plaintiffs urge the proceeding involves an adjudication of disputed facts which cannot be determined without a hearing.

■■■ It is clear that the ITC must hold a hearing upon the request of an interested party whenever the ITC conducts a review

of an affirmative determination of injury under 19 U.S.C. § 1675(d). *See also* S.Rep. No. 249, 96th Cong., 1st Sess. 80, *reprinted in* 1979 U.S. Code Cong. & Admin. News 381, 466. There is no similar requirement for a hearing at the *preliminary* changed circumstance determination stage. Instead the agency has established a notice and comment procedure. See 19 CFR § 207.45(b)(2). If Congress had intended hearings at this initial stage, Congress could have provided or mandated them. In amending § 1675(b) in the Trade and Tariff Act of 1984, Congress did not alter the ITC's discretion to administer the preliminary changed circumstance provision. It is therefore apparent that no hearing is expressly required or can be fairly implied · from the statute.

Plaintiffs urge, however, that § 1675(b) was introduced to provide more procedural safeguards. Motion for Judgment on the Agency Record, *supra*, at 39 (citing S.Rep. No. 249, 96th Cong., 1st Sess. 81 (1979)). Nevertheless, Congress also intended § 1675(b) to provide a greater role for domestic interested parties. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 81, *reprinted in* 1979 U.S. Code Cong. & Admin. News 381, 467. In light of the unique nature of these reviews based on changed circumstances, *i.e.*, they are predicated upon an outstanding antidumping or countervailing duty order, the agency's procedures in this case

appear to be designed to achieve the desired result.[12]

Plaintiffs argue, however, that "[n]umerous cases have ruled that '[w]here adjudicative ... facts are involved the parties must be afforded a hearing to allow them to meet and to present evidence.'" Motion for Judgment on the Agency Record, *supra*, at 38 (citations omitted). In the plaintiffs' view, an evidentiary hearing must be held when there are disputed issues of material fact, and due process forbids an agency from using evidence in such a way as to foreclose the opportunity to present a contrary presentation. *Id.* at 38–39.

■ However, Congress has stipulated that antidumping and countervailing duty proceedings are investigatory rather than adjudicatory in nature. H.R.Rep. No. 317, 96th Cong., 1st Sess. 77 (1979); S.Rep. No. 249, 96th Cong., 1st Sess. 100, *reprinted in* 1979 U.S. Code Cong. & Admin. News 381, 486. *See also Budd Co. Ry. Division v. United States*, 1 CIT 67, 72, 507 F.Supp. 997, 1001 (1980). In an investigative proceeding, an agency need not provide those rights of apprisal, cross-examination, and confrontation applicable in an adjudicatory proceeding. *See, e.g., Hannah v. Larche*, 363 U.S. 420, 441–52, 80 S.Ct. 1502, 1514–20, 4 L.Ed.2d 1307 (1960) (Hearing or trial type procedures not required by Civil Rights Commission in an investigative pro-

---

**12.** Section 1677c(a) provides for a hearing by the administering authority and the ITC before a final determination in an antidumping or countervailing duty investigation. In discussing this provision, Congress specified:

> Section 774 continues the requirement of present law with respect to hearings in antidumping duty investigations, and adds a requirement for hearings in countervailing duty investigations. While these required hearings are not subject to the provisions of Title 5 of the United States Code relating to adjudicative hearings, they must be conducted in a manner designed to permit full presentation of information and views. It is particularly important, in light of the provision for judicial review of such proceedings on an administrative record, as provided by this bill, that parties be given every possible opportunity to respond to information submitted by other parties.

S.Rep. No. 249, 96th Cong., 1st Sess. 97, *reprinted in* 1979 U.S. Code Cong. & Admin. News 381,

483. Citing this passage, plaintiffs urge the ITC should have afforded them the opportunity to respond to the information submitted by other parties. This aspect of the legislative history, however, is inapplicable since it relates to the specific requirement for a hearing before a final antidumping or countervailing duty determination. The passage clearly indicates that Congress disapproved of the suggestion that the hearings could be conducted without sufficient procedural safeguards, while affirming congressional intent that Title 5 of the United States Code would not apply. In a preliminary changed circumstance determination, by contrast, no hearing at all is required. Furthermore, the Court observes that if Title 5 does not apply in final antidumping or countervailing duty determinations, then it strains credulity to believe that Title 5 would apply in the context of a preliminary changed circumstance determination.

ceeding); *Pasco Terminals,* 83 Cust.Ct. at 78, 477 F.Supp. at 213 ("due process does not necessarily require a trial-type hearing or an opportunity to confront and cross-examine witnesses").

In one of the cases cited by plaintiffs, the court examined the procedures required in adjudicatory proceedings and held that a hearing was required. *See Alaska Airlines, Inc. v. C.A.B.,* 545 F.2d 194, 200 (D.C.Cir.1976) ("Where adjudicative, rather than legislative, facts are involved, the parties must be afforded a hearing to allow them an opportunity to meet and to present evidence." (footnote omitted)). In another case, the Supreme Court expressly recognized that a hearing is not required in a non-adjudicatory proceeding. *See United States v. Florida East Coast Ry.,* 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973).

In the other cases cited by plaintiffs, the courts recognized that a hearing was expressly required by statute. *See RKO General, Inc. v. F.C.C.,* 670 F.2d 215, 226 (D.C.Cir.1981), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982) (a hearing is required by statute when a "substantial and material question of fact is presented"). *See also Railroad Com'n of Texas v. United States,* 765 F.2d 221, 227–28 (D.C.Cir.1985); *Sea–Land Service, Inc. v. United States,* 683 F.2d 491, 495 (D.C. Cir.1982). While both the *Railroad Com'n* and *Sea–Land Service* decisions held that hearings were required, the agency had "substantial flexibility" to structure these hearings. *Railroad Com'n,* 765 F.2d at 228; *Sea–Land Service,* 683 F.2d at 495. In other words, formal proceedings were not required. 765 F.2d at 227–28; 683 F.2d at 495. To qualify this position, both courts ruled that "[a]n evidentiary hearing must be conducted where there are disputed issues of material fact." 765 F.2d at 228 (citations omitted); 683 F.2d at 496 (citations omitted). Neither decision is authority for the provision of a hearing in a § 1675(b) investigation since both cases involved a statute which made express provision for a hearing. This action, by contrast, is clearly distinguishable since sec-

tion 1675(b) does not require a hearing at the preliminary stage.

Plaintiffs also contend that the inadequacy and unfairness of the proceedings are especially egregious with respect to three of the majority's conclusions: (1) current low import levels result not from the acquisition of the New Castle mill but from the 1973 determination; (2) current Swedish exports to the EC are not unrestricted and that future exports may be restricted further; and (3) the level of Swedish exports to the EC is below the levels of the 1970s.

With regard to the first conclusion, plaintiffs contend that even if the request for review did not conclusively establish that current import levels result from the acquisition, "plaintiffs clearly presented enough evidence to raise a serious question concerning the reason for current low import levels." Motion for Judgment on the Agency Record, *supra,* at 40–41. In the plaintiffs view, there was a disputed issue of material fact, and the ITC should have therefore conducted a full investigation. *Id.* With regard to the second conclusion, plaintiffs contend the Swedish Ambassador's letter should have been sufficient to prevent a contrary conclusion, at least without a full investigation. Furthermore, plaintiffs contend, the possibility of future restrictions by the EC was not addressed at all in submissions to the EC. Plaintiffs urge that if the ITC believed this question was relevant, the ITC should have conducted a full investigation. Thus, plaintiffs appear to argue that since they raised a disputed issue of fact, they were entitled to a full investigation. Plaintiffs also appear to dispute the ITC's ability to consider and weigh conflicting evidence.

However, neither the statute, regulations, nor pertinent case law require the ITC to provide procedures beyond notice and comment at the preliminary changed circumstance stage. In making its determination, the ITC may consider and weigh conflicting evidence. *See American Lamb,* 785 F.2d at 1002. To require the ITC to conduct a review whenever the ITC is presented with conflicting evidence would be tantamount to a prohibition on

the exercise of this authority. It would further inhibit the agency in its effort to weed out those cases clearly without merit. *Id.*

Finally, plaintiffs contend the majority summarily rejected their reply brief and thereby prevented them from rebutting the allegedly misleading data supplied by the defendant-intervenors. It appears Avesta sought to submit the reply primarily to include data regarding cold-rolled stainless steel plate exports to the EC. The Court has previously determined, however, that the level of cold-rolled exports to the EC is irrelevant to the issue of the level of hot-rolled exports to the United States. Thus, contrary to Avesta's assertions, the ITC's refusal to accept their untimely submission did not cause them "egregious" harm.

## CONCLUSION

For the reasons provided above, the Court holds the agency's dismissal of plaintiffs' request for review and modification or revocation of a 12–year old finding of dumping against stainless steel plate from Sweden was reasonable and not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," within the meaning of 19 U.S.C. § 1516a(b)(1)(A). Accordingly, plaintiffs' motion is denied, and the determination is sustained.